UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DARLENE COLEMAN,

      Plaintiff,

v.                                 Case No:   6:14-cv-527-Orl-22TBS

STARBUCKS CORP.,

      Defendant.

_____

## AMENDED REPORT AND RECOMMENDATION[1]

Pending before the Court is Defendant's Motion for Summary Judgment. (Doc 44).

Upon due consideration I respectfully recommend that the motion be granted.

## I.  Background

### A. Procedural History

Plaintiff Darlene Coleman is suing her former employer, Defendant Starbucks

Corp., for racial discrimination and retaliation in violation of 42 U.S.C. § 1981 and the

Florida Civil Rights Act of 1992 ("FCRA"), FLA. STAT. § 760.01 et seq., (Doc. 10).

Defendant denies liability and has asserted 19 affirmative defenses (Doc. 27).   On

October 28, 2014, the parties met for their initial case management conference (Doc. 42

at 2; Doc. 43 at 2).   During the meeting, Defendant served interrogatories, requests for

production of documents, and requests for admission on Plaintiff (Doc. 42 at 2; Doc. 43 at

2; Doc. 44-1).   Plaintiff expressed uncertainty about whether she could respond to the

requests within the 30-day period and Defendant's lawyer told her to "do the best you

---

[1] The original Report and Recommendation is amended to include a statement of the parties' right to make written objections in accordance with 28 U.S.C. § 636, and M.D.Fla.R. 6.02, within fourteen (14) days after service of this Report and Recommendation.

can," adding that he would give her an extra two weeks, and "if you need more time let us know."   (Doc. 43 at 2).

Plaintiff did not respond to Defendant's discovery requests and failed to make her initial disclosures by the November 10, 2014 deadline (Doc. 47 at 2).   The parties conferred but Defendant's efforts to obtain discovery ended in early February 2015 when Plaintiff said she was "not giving [Defendant] anything until they provide me with" certain documents (Doc. 43 at 3; Doc. 47 at 2).

It does not appear that Defendant did anything concerning the discovery for two months (Doc. 47 at 2-3; Doc. 55 at 2).   Then, just two weeks before the discovery deadline, it attempted to schedule Plaintiff's deposition (Doc. 42-4; Doc. 42-5 at 1; Doc. 43 at 5; Doc. 47 at 3).   When she refused, Defendant moved on the eve of the discovery deadline for an order compelling Plaintiff to make her initial disclosures, respond to the interrogatories and production requests, and sit for her deposition (Doc. 42).   I denied most of the requested relief, citing Defendant's lack of diligence and the bloated and overly burdensome nature of Defendant's discovery requests (Doc. 47). But, I ordered Plaintiff to provide her initial disclosures (Id.).

On May 14, Defendant moved for summary judgment (Doc. 44).   Its motion relies primarily on the requests for admission Plaintiff failed to respond to and which Defendant argues are deemed admitted under Rule 36 of the Federal Rules of Civil Procedure (Doc. 44 at 3-4; Doc. 44-1).   The requests make clear that "[u]nless a written answer or objection is served upon the undersigned within thirty (30) days from the date of service hereof, the matters as to which admissions are requested will be deemed admitted pursuant to the Federal Rules of Civil Procedure."   (Doc. 44-1 at 2).   The matters Defendant asked Plaintiff to admit or deny are:

1. Admit or deny that while working as a Starbucks partner, you were required to provide availability to work three days a week.

2. Admit or deny that you were not available to work three days a week.

3. Admit or deny that while working as a Starbucks partner, you were required to provide 18 hours of availability a week.

4. Admit or deny that you did not provide 18 hours of availability a week.

5. Admit or deny that to maintain your employment at Starbucks, you were required to work a minimum of 12 hours a week.

6. Admit or deny that you regularly worked less than 12 hours a week.

7. Admit or deny that no one at Starbucks made derogatory comments about your race.

8. Admit or deny that your employment at Starbucks was terminated by Patricia Davila because of your insubordinate, unprofessional behavior.

9. Admit or deny that Starbucks did not treat similarly situated employees outside your race more favorably.

10. Admit or deny that you were not qualified to perform your job.

11. Admit or deny that you were not discriminated against based on your race.

12. Admit or deny that you were not retaliated against for engaging in protected activity.

13. Admit or deny that your insubordinate and unprofessional conduct constitutes a legitimate, nondiscriminatory reason for your termination.

14. Admit or deny that you were not terminated based on your race.

15. Admit or deny that you were not terminated for making any internal complaints.

(Doc. 44-1 at 5-6).

Defendant contends that because Plaintiff "has failed to serve a written answer to Defendant's Request for Admissions within 30 days, they are deemed admitted." (Doc. 44 at 3-4).   Defendant also argues that Plaintiff "cannot present testimony contrary to these admissions."   (Doc. 44 at 4).   In addition to the unanswered admissions, Defendant attached a declaration from its District Manager Patricia Davila and several documents from Plaintiff's personnel file as evidence in support of its summary judgment motion (Doc. 44-3).

In her response to the motion Plaintiff acknowledges Defendant's argument that "because [she] ha[s] failed to serve a written answer to [Defendant's] requests for admission within 30 days they are deemed admitted."   (Doc. 51 at 2).   Plaintiff states that she will not "dispute" or "give testimony" that is contrary to the admissions, but that she "will ... dispute ... Davila['s] False Declaration that [Defendnat] Used To Support Their Defense" and that she will prove that the documents Defendant submitted in support of its motion are false (Doc. 51 at 2).   Plaintiff asserts that her response is based on her personal knowledge and the last page states, "Pursuant to 28 U.S.C. 1746, I verify under penalty of perjury under the laws of the United States of America that the forgoing [sic] is true and correct."   (Doc. 51 at 20).   Her response includes her notarized signature. Because Plaintiff's response contains a verification that complies with 28 U.S.C. § 1746 and is based on personal knowledge, it is an "affidavit" for purposes of Rule 56. Attached to Plaintiff's response are several exhibits, including communications between her and Defendant, copies and photographs of time schedules, copies of documents from Plaintiff's personnel file, unsworn handwritten and typewritten letters from customers and co-workers, unsworn typewritten documents Plaintiff prepared that appear to be

additional statements of fact and legal arguments, and other photographs.   Many of these exhibits contain Plaintiff's handwritten notations.

On June 30, 2015, Defendant filed a reply in support of its summary judgment motion (Doc. 56).   Defendant underscores Plaintiff's statement that she is not "disput[ing]" or "giv[ing] testimony" that is contrary to her deemed admissions (Id. at 2-3).   "[B]ased on [Plaintiff's] admissions alone," Defendant argues, it is entitled to summary judgment (Id. at 3).   In a footnote, Defendant states that "[t]o the extent that Plaintiff contradicts her admissions, [it] will address these contradictions in a separate motion to strike."   (Doc. 56 at 3 n. 3).   As of this date, no motion to strike has been filed.   In the remainder of the reply, Defendant argues that Plaintiff has failed to produce evidence sufficient to raise a jury question on several elements of her discrimination and retaliation claims (Id. at 3-7).   Defendant makes no argument that the evidence Plaintiff relies on cannot be presented in an admissible form at trial, see FED. R. CIV. P. 56(c)(2), that Plaintiff lacks personal knowledge of any of the facts she asserts in her response, see FED. R. CIV. P. 56(c)(4), or that any of the third-party statements in the exhibits lack the declaration required by 28 U.S.C. § 1746.

B. Factual Record[2]

Plaintiff was hired as a part-time barista (her official title was "Partner") at one of

---

[2] The facts in this recitation are drawn from the parties' submissions (see Docs. 65-69, 72-74, 81-84, 87-89) and are uncontroverted or, where controverted, are taken in the light most favorable to Plaintiff. See Battle v. Bd. of Regents, 468 F.3d 755, 759 (11th Cir. 2006).   Solely for the purposes of this section, I have ignored Plaintiff's deemed admissions and rely chiefly on her response to the motion for summary judgment.   I have also considered the unsworn exhibits (Doc. 51-2 at 6; Doc. 51-11 at 4-6; Doc. 51-12 at 17-18; Doc. 51-13 at 6-7; Doc. 51-14 at 2-5, 14-15), which can reasonably be construed as a part of her sworn response.   See Wojciechowski v. National Oilwell Varco, L.P., 763 F. Supp. 2d 832, 845 (S.D. Tex. 2011), and cases cited therein.   I do not rely on the unsworn letters from the co-workers and customers. See Gordon v. Watson, 622 F.2d 120, 123 (5th Cir. 1980), which along with other Fifth Circuit opinions handed down prior to the close of business on September 30, 1981, is binding on this Court under Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

Defendant's Orlando franchises on January 7, 2012 (Doc. 20, ¶ 1; Doc. 27, ¶ 1).

Defendant requires its part-time baristas to work a minimum number of hours per week,

though the precise number is unclear from the record.   In its Statement of Undisputed

Facts, Defendant asserts that part-time baristas must "provide ... a minimum of three (3)

days of availability" and "18 hours of availability" per week, and must work at least 12

hours per week (Doc. 44 at 4-5).   One of the documents Plaintiff has provided, a "Partner

Information & Availability Agreement Form" which bears Defendant's logo, states that

baristas must "be available to work at least three shifts per week or 16 hours/week (for

weekend-only partners)."   (Doc. 51-12 at 3).   It also states that part time partners "must

be available to work 150%+ of targeted hours (i.e. 20 hours targeted = 30+ hours

available)."   (Id.).

Defendant has not consistently adhered to its minimum hour policy.   Plaintiff

alleges in her complaint that during the first six months of her employment she typically

worked less than 10 hours per week (Doc. 20, ¶ 17-18), and she has provided work

schedules that support this claim (Doc. 51-12 at 9; see also Doc. 20-1 at 20-21).   During

this period, Plaintiff had no disciplinary write-ups and by all accounts did her job well

(Doc. 51 at 5, 6).

On June 18, 2012, Rebecca Schott became manager of the store where Plaintiff

worked (Doc. 20, ¶ 14; Doc. 27, ¶ 14).   Almost immediately, Plaintiff's relationship with

her employer began to deteriorate.   In late June, Schott left a sticky note, visible to all of

Plaintiff's co-workers, stating that Plaintiff was "NC/NS" (no-call/no-show) on "Sat[urday],"

an allegation Plaintiff denies (Doc. 51 at 13; Doc. 51-12 at 4).   In early July, Schott took

Plaintiff off the schedule for an entire week without warning, and informed Plaintiff that

she would not give Plaintiff any hours unless Plaintiff provided 24 hours of availability

(Doc. 51 at 7, 14; Doc. 51-12 at 6).   The following week, Plaintiff provided 24 total hours of availability on Monday, Saturday, and Sunday, and she was assigned 17 hours of time over those three days (Doc. 51 at 14; Doc. 51-4 at 2; Doc. 51-12 at 7).   When Plaintiff asked for a day off, Schott told her she would have to take vacation time and that she would still have to put in at least 16 hours that week (Doc. 51 at 7).   Toward the end of July, Schott took away Plaintiff's preferred Sunday shift (6:30-10:30 AM) and made her work from 6:30 AM to 3:00 PM, on the basis that her previous shift did not meet the needs of the store (Doc. 51 at 7, 14; Doc. 51-12 at 8).   Then Schott gave Plaintiff's old shift to a new employee, Katherine Welker, who is Caucasian (Doc. 51 at 7, 14; Doc. 51-12 at 8).

On July 31, Plaintiff contacted Partner Resources (Defendant's name for its human resources department), to complain about Schott (Doc. 44-3, ¶ 14; Doc. 51 at 13).   Plaintiff maintains that she complained about racial discrimination and retaliation, but Defendant disputes this (Doc. 44-3, ¶ 14; Doc. 51 at 13).   On August 10, Plaintiff attended a conference call with Defendant's District Manager Pat Davila, her predecessor Stacey Misenick, and Partner Resources Manger Tyler Haugen.   During the call, Plaintiff was informed that she was not meeting Defendant's optimal scheduling requirements and told to provide increased availability by August 13, which Plaintiff did (Doc. 44-3 at 15).

Defendant alleges that on July 31, Plaintiff was given a "corrective action" for hanging up on Schott, and that on August 28, Plaintiff was given a "corrective action" for arriving 59 minutes late to her 5:30 AM shift on Sunday, August 26 (Doc. 44-3 ¶¶ 6, 8; Doc. 44-3 at 9, 13).   Plaintiff insists that she was never given these corrective action forms and that the information in them is false (Doc. 51 at 8, 10-11).

On September 19, Partner Resources concluded its investigation of Plaintiff's complaint (Doc. 44-3, ¶ 15, p. 15-16).   In a letter documenting the conclusion of the

investigation Defendant stated that it "requires availability of at least three shifts.   For a

'weekend only' partner, the requirement is 16 hours.   Partners must also be available

150% of the targeted hours."   (Doc. 44-3 at 15-16).   The letter acknowledges that

Plaintiff provided increased availability in August, but states that even the increased

availability "did not meet the Company's optimal scheduling requirements."   (Id.).   The

letter states that Plaintiff was "again asked to make yourself available for the [required]

hours" but that "[t]o date," Plaintiff had not done so (Id.).   Finally, the letter instructed

Plaintiff to provide Davila with sufficient availability by September 24 (Id.).   It is not clear

whether Plaintiff provided the availability; but, because she was not disciplined for not

doing so, it is reasonable to infer that she did, at least for the time being.

    The ongoing disputes between Plaintiff and Schott resurfaced in October.   On

October 1, when Schott was out of work, Plaintiff requested a shift change, which was

approved by a shift manager (Doc. 51 at 9).   When Schott returned, she crossed out

Plaintiff's shift change, retroactively disapproving it (Id.).   Schott did not do this for other

shift changes that had been approved in her absence (Id.).   Then, Plaintiff caught the flu,

which forced her to leave early on October 13 and call in sick on October 14 and 15 (Id.).

On October 15, Plaintiff sent Davila a text asking why her hours were reduced; Davila

responded that while Plaintiff was required "to be available for 18 hours," Defendant is

"not required to work you any more than the minimum 12."   (Doc. 51 at 16; Doc. 51-13 at

12).

    On October 17, Plaintiff called Partner Resources to "report[] Ms. Schott and Ms.

Davila for Racial Discrimination and Retaliation cutting my hours down to 12 when they

made me work 16 to maintain my job at Starbucks and for not giving me my 6 month

review."   (Doc. 51 at 9).   The following day, Schott completed another "Corrective Action

Form" to serve as "a written warning of violation of the time and attendance policy." (Doc. 44 at 5; Doc. 44-3 at 10; Doc. 51-1 at 11).   The form states that Plaintiff was "27 minutes late for her shift on 10/1."   It also states that Plaintiff "called in at 6:32 am after the start of her 6:30 am shift to tell us she was sick."   The date of the second incident is not provided, but context points to October 14.   Finally, the form states that Plaintiff "called in for the following shift on 10/15 as well."   In a section entitled "Corrective Action," the form states that Plaintiff was warned about these violations on October 20 and that "Partner is aware of the time and attendance policy."   (Doc. 44-3 at 10; Doc. 51-1 at 11).   Plaintiff refused to sign the form and maintains that the accusations in it are false (Doc. 44-3 at 10; Doc. 51 at 7, 9; Doc. 51-1 at 11).

Plaintiff's personnel file contains another corrective action form dated October 23 (Doc. 44-3, ¶ 6, p. 11).   The form, which was completed by Schott, states that it "constitutes a final written warning of a violation of the time and attendance policy. [Plaintiff] notified the store manager at 11:45 am on 10/22 she would not be attending her closing shift of 530p-930p due to the fact that she had an exam at school."   (Doc. 44-3 at 11).   The form records that Plaintiff was provided a final written warning, but does not say when the warning was provided (Id.).   The line for "Partner Signature" is blank (Id.). Plaintiff says she was never provided with this warning and that the statements in it are false (Doc. 51 at 10).   Plaintiff points out that she could not have been issued a warning on October 23, because she was not at work that day (Id.).

At some point in November, Plaintiff contacted the EEOC alleging racial discrimination and retaliation, but she declined to file a charge and the EEOC made no further inquiry (Doc. 51-3 at 8).   The EEOC's closing letter states that Defendant was not informed of Plaintiff's inquiry, and there is no evidence suggesting otherwise (Id.).

In late fall 2012, tensions between Plaintiff and Defendant boiled over.   Well in advance of November 26, Plaintiff requested to be off on that date (Doc. 51-11 at 4).   On November 19, Schott left Plaintiff a voice message saying she "can't approve [Plaintiff's] day off for 11-26-2012 because the schedule was already made."   (Id.).   Later that day, Plaintiff obtained a photograph of the schedule from a co-worker who was working that day; the schedule was time-stamped November 19 at 12:47 PM.   (Id. at 4, 8).   Based on the timestamp, Plaintiff believes Schott lied to her when she said the schedule had already been made (Id. at 4).   Later that week, Plaintiff noticed that a revised schedule had been posted, and that in the new schedule, Schott had "giv[en] her Caucasian friends more hours."   (Id.; see also id. at 7, 8).

During her shift on November 26, Plaintiff asked Schott why she refused Plaintiff time off but "revised the schedule giving other Caucasian Partners more hours." (Doc. 51-14 at 4).   Schott said Davila told her to deny the requested day off (Id.). Plaintiff "told Schott 'that this is the last Retaliation,'" and left the store in tears (Id. at 5). She called Rachael Johnson at Partner Resources and asked if Johnson had asked Plaintiff's Shift Manager, Jessica Clayton, about Plaintiff's complaints (Id.).   Johnson said she had not yet done so (Id.).   Feeling that Johnson was not taking her complaints seriously, Plaintiff asked to speak with Johnson's supervisor; Johnson said her supervisor would give Plaintiff a call (Id.).   On November 28, Johnson's supervisor, Christine McWerter, called Plaintiff (Doc. 51-14 at 5).   Plaintiff complained that Johnson was not adequately investigating her complaint and that Schott "is racist and that I have proof." (Id.).   McWerter told Plaintiff that "it shouldn't take Mrs. Johnson that long to contact Ms. Clayton," and she would "investigate and get back to" Plaintiff (Id.).

Plaintiff did not hear back from McWerter.   Instead, during her next shift on December 1, Davila and Schott took Plaintiff aside and gave her a performance review and final warning.   The performance review, dated July 7, 2012, gives Plaintiff ratings of "2" on a scale of 1-4 in each of nine "key responsibilities," indicating that Plaintiff "me[t] expectations" in each area (Doc. 51 at 16; Doc. 51-3 at 2).   The review noted several "performance improvement opportunities," including that Plaintiff was a "poor communicator," did not "understand performance expectations" or "take[] responsibility" for her performance, and "show[ed] little interest in learning new skills."   (Doc. 51-3 at 2-3).   The review required Plaintiff to spend the last ten minutes of every shift "returning to basics to check for understanding in" several job responsibilities (Id. at 3).   Both Schott and Davila signed the form which is dated December 1, 2012 (Id. at 2).

The final written warning is also dated December 1, 2012 and states that it "serves as [Plaintiff's] final written warning in regards to three different areas of performance in which [Plaintiff] is failing to meet company standards [and] expectations."   (Doc. 44-3 at 6).   The three areas, identified on a page entitled "Corrective Action Plan Form," are: "Time [and] Attendance," "Minimum Hours," and "Processional Work Place Conduct." (Id. at 7).   The form states that Plaintiff will be fired if she "violates any of the standards covered on this corrective action."   (Id. at 6).

Plaintiff refused to sign the performance review or corrective action form because she believed the statements in them were false (Id. at 6; Doc. 51 at 16; Doc. 51-3 at 2). Plaintiff asked Davila if Partner Resources knew about this; Davila responded that "'Mcwerter and ... Johnson and our legal department told me to do it.'"   Then, Plaintiff complained to Davila that Schott had been giving favorable treatment to Caucasian

partners (Id.).    Davila told Coleman to lower her voice (Id.).    Plaintiff protested that she was not being loud (Id.).    At this point, Davila fired her (Id.).

In her response to Defendants' summary judgment motion, Plaintiff mentions several other incidents involving Schott that she believes support her case.    She claims Schott made racially charged comments on two separate occasions.    First, Plaintiff alleges that when an African-American partner from another store covered a shift at the store where Schott was manager, Schott remarked that the partner "is black and looks like Aunt J[e]mima."   (Doc. 51-14 at 14).    An African-American shift manager took offense to this remark, telling Schott it was "disrespectful and unprofessional."    (Id.).  Second, on or shortly before Election Day, Schott was asked what she wanted for her birthday (Id.).    She said that she wanted "a White President in the White House."    (Id.).

Plaintiff alleges that Schott "got rid of all the African American employees in our store" in her first year as manager (Id. at 15).    Plaintiff lists five employees, including herself, who were either "terminated" or "forced out."    (Id.).    According to Plaintiff, the store had no African American employees between July 2013 and February 2014 (Id. at 15).    Plaintiff claims Defendant forced Schott to hire African American partners "to try to cover themselves" after they heard from her lawyers in early 2014 (Doc. 51-11 at 6).  Plaintiff notes that three of the four African American partners complained to Partner Resources about discrimination and were subsequently terminated.

Plaintiff also complains that on many occasions, Schott subjected her to petty slights like not telling her about meetings, changing her tip envelopes, which she had decorated with religious messages, and turning around her Christmas stocking so nobody could see it (while leaving the other employees' stockings alone) (Doc. 51-14 at 4).

Finally, Plaintiff complains that Schott allowed a Caucasian partner to park in a parking space in front of the store, but refused to allow Plaintiff to do so (Id.).

## II.  Legal Standard

A. Summary Judgment

A party is entitled to summary judgment if it can show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  An issue of fact is "genuine" if the evidence is such that a reasonable jury could find the fact in favor of the nonmoving party and "material" if the fact "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Avenue CLO Fund, Ltd. v. Bank of America, N.A., 723 F.3d 1287, 1294 (11th Cir. 2013).

On a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor.  Avenue CLO Fund, 723 F. 3d at 1294 (citing Blackston v. Shook & Fletcher Insulation Co., 764 F. 2d 1480, 1482 (11th Cir. 1985)).  Reasonable inferences do not include those "based on speculation and conjecture."  Blackston, 764 F.2d at 1482.  The Court "must avoid weighing conflicting evidence or making credibility determinations." Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000).

The party moving for summary judgment must show that no genuine issue of material fact exists.  Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991); Watson v. Adecco Emp't Servs., Inc., 252 F.Supp.2d 1347, 1351-52 (M.D. Fla. 2003).  The moving party can meet this burden in one of two ways: by directly negating an essential element of the nonmoving party's claim, or by showing that there is insufficient evidence in the materials on file for the

nonmoving party to establish its burden of proof at trial.  <u>Clark</u>, 929 F.2d at 608. When the moving party demonstrates an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of proof at trial, the nonmoving party must then "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  <u>Celotex Corp.</u>, 477 U.S. at 324-35 (internal quotations and citations omitted); <u>Clark</u>, 929 F.2d at 608.   In determining whether a fact is genuinely disputed, the Court may consider evidence not cited by the parties, but it is not required to do so.  FED. R. CIV. P. 56(c)(3).   If a party fails to support an assertion of fact or fails to address another party's assertion of fact, the court may "(1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if ... the movant is entitled to it; or (4) issue any other appropriate order."  FED. R. CIV. P. 56(e).

 B. Substantive Law

 Plaintiff brings claims for disparate treatment based on race and retaliation under § 1981 and the FCRA.   Courts have generally applied standards governing Title VII disparate treatment claims to similar claims of racial discrimination under § 1981 and the FCRA.   See <u>Jimenez v. Wellstar Health Sys.</u>, 596 F.3d 1304, 1312 (11th Cir. 2010) (§ 1981); <u>Harper v. Blockbuster Entm't Corp.</u>, 139 F.3d 1385, 1387 (11th Cir. 1998) (FCRA).   Likewise, courts have generally construed claims for retaliation under § 1981 and the FCRA to be coextensive with Title VII retaliation claims.   <u>Jimenez</u>, 596 F.3d at 1312 (§ 1981); <u>Harper</u>, 139 F.3d at 1387 (FCRA).   Plaintiff does not argue otherwise. Accordingly, except as otherwise noted herein, I find for purposes of this Report and

Recommendation that Plaintiff's disparate treatment and retaliation claims are governed by the standards governing analogous claims under Title VII.[3]

1. Disparate Treatment

A plaintiff suing for race discrimination under Title VII (and by extension, § 1981 and FCRA) may proceed under two separate theories: disparate treatment and pattern or practice discrimination (also called "disparate impact"). EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000). Plaintiff's race discrimination claims are based on a disparate treatment theory (Doc. 20, ¶¶ 57, 61, 68). The disparate treatment provision of Title VII declares it an "unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2002e-2(a)(1); cf. FLA. STAT. § 760.10(1)(a) (employing similar language). Subsection (m) of § 2002e-2, added in 1991, clarifies that "[e]xcept as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

---

[3] The Supreme Court's recent 5-4 opinions interpreting federal employment discrimination statutes have raised questions as to the continuing validity of construing FCRA as coextensive with federal employment discrimination statutes. See Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013); Vance v. Ball State Univ., 133 S. Ct. 2434 (2013); Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). The Court's recent decisions on causation (Gross and Nassar) rely heavily on differences in language between Title VII's antidiscrimination provision on the one hand, and Title VII's antiretaliation provision and the Age Discrimination in Employment Act's antidiscrimination provision on the other. There is no textual basis for such a distinction in the FCRA. Both plaintiff and defendant-side practitioners have noted this conundrum and (perhaps predictably) proposed very different ways to resolve it. Compare Kendra D. Presswood, Interpreting the Florida Civil Rights Act of 1992, 87-DEC Fla. B.J. 36 (2013); with Darren A. Schwartz, Gross v. FBL Financial Services, Inc.: Time to Apply the "But For" Burden of Proof to FCRA Discrimination Claims, 86-AUG Fla. B.J. 55 (2012).

Despite the relatively clear language of Title VII, the Supreme Court has erected an intricate[4] set of rules and standards for analyzing disparate treatment claims on a motion for summary judgment or judgment as a matter of law.   These decisions establish two different analytical frameworks for evaluating such claims.

First, a plaintiff "may prove intentional discrimination through the familiar McDonnell Douglas" burden-shifting approach.   Joe's Stone Crab, 220 F.3d at 1286; see generally McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).   Under the McDonnell Douglas framework, a plaintiff must first present evidence sufficient to establish a "prima facie case of disparate treatment."   Joe's Stone Crab, 220 F.3d at 1286.   The specific elements of a prima facie case under the McDonnell Douglas framework vary depending on the context, Swierkiewicz v. Sorema N.A., 534 U. 506, 512, but in all cases, the plaintiff must show "that she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination."   Bennett v. Widstream Commc'ns, __ F.3d __, __, 2015 WL 4126970, at *4 (10th Cir. 2015); see also Burdine, 450 U.S. at 253; Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002).

How a plaintiff may satisfy the third requirement–presenting sufficient evidence to support an inference of discrimination–depends on the nature of the case.   In most, if not all cases, the plaintiff must show that she was qualified for a benefit (such as a job, a bonus, or a promotion), if the adverse action in question was denial of a benefit, see, e.g.,

---

[4] The Eleventh Circuit has described the McDonnell Douglas framework as "a complicated legal doctrine" and has forbidden district courts to "instruct the jury on the McDonnell Douglas analysis" because such an instruction is likely to confuse the jury.   Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1333 (11th Cir. 1999).

Springer v. Convergys Customer Mgmt. Gp., Inc., 509 F.3d 1344, 1347-48 (11th Cir. 2007), or that the plaintiff was meeting the employer's legitimate expectations, if the adverse action was punishment or some other detrimental action (such as discharge), see, e.g., Brockman v. Avaya, Inc., 545 F. Supp. 2d 1248, 1253 (M.D. Fla. 2008) (citing Ferrell v. Masland Carpets, Inc., 97 F. Supp. 2d 1114, 1124 (S.D. Ala. 2000); Dignman v. Delta Health Gp., Inc., 26 F. Supp. 2d 1349, 1352 (S.D. Fla. 1998).   This element ensures that the prima facie case serves the "important function" of "eliminat[ing] the most common nondiscriminatory reasons for the plaintiff's rejection," namely, lack of qualification or poor performance.   Burdine, 450 U.S. at 253-54.

In addition to ruling out lack of qualification, a plaintiff must also typically provide some circumstantial evidence pointing to discrimination as the real reason for the employer's decision.   Presenting "comparator" evidence–that is, evidence that the employer "treated [the plaintiff] less favorably than a similarly situated individual outside of [the plaintiff's] protected class," Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1325 (11th Cir. 2011)–is one way to do this, but by no means the only way.   "Substantial statistical proof" of a "pattern of discrimination" may "alone ... establish a prima facie case," Hawkins v. Ceco Corp., 883 F.2d 977, 985 (11th Cir. 1989)–provided, of course, the statistics have a proper "analytical foundation," Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004).   Alternatively, "a plaintiff may use 'non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination' and thereby create a triable issue."   Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1255 (11th Cir. 2012) (quoting Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012)).   The Eleventh Circuit has also held that a plaintiff in a termination case may establish a prima facie case of discrimination by showing "that she was

replaced by a person outside the protected class." Coutu v. Martin Cnty. Bd. of Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995).   Finally, if the plaintiff's position is not filled and her job duties are instead absorbed by or redistributed to other employees, many courts have held that a plaintiff can establish "the critical inference of discrimination ... when 'the terminated employee's duties are absorbed by other employees not in the protected class.'"[5]

As this discussion illustrates, "[t]he methods of presenting a prima facie case are flexible." Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010). But, "[w]hatever form [the plaintiff's evidence] takes," the issue before the court at the summary judgment stage boils down to whether "the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff.'" Gate Gourmet, 683 F.3d at 1256 (quoting Smith, 644 F.3d at 1328).

If the plaintiff meets her burden of presenting a prima facie case of discrimination, a presumption of discrimination arises, and the employer must then "produc[e] evidence that ... a legitimate, non-discriminatory reason" motivated the decision. Burdine, 450 U.S. at 254.   "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." Id. at 255.   The burden then shifts back to the

---

[5] See, e.g., Wilkerson v. Schirmer Eng'g Corp., 2006 WL 228818, at *4 (D. Colo. Jan. 30, 2006) (quoting Bellaver v. Quanex Corp., 200 F.3d 485, 495 (7th Cir. 2000)); see also Filar v. Bd. of Educ. of City of Chicago, 526 F.3d 1054, 1060-61 (7th Cir. 2008) (explaining that, in a "mini-R[eduction]-I[n]-F[orce]" case, where an employee is discharged and her duties absorbed by other employees, the plaintiff can establish a prima facie case by showing that those who absorbed her duties were not in her protected class); Plotke v. White, 405 F.3d 1092, 1100 n. 9 (10th Cir. 2005) ("We have rejected an employer's argument that no inference of discrimination can be drawn where an employee's position was eliminated and his duties were divided among other employees not in the protected class." (citing Abuan v. Level 3 Commc'ns, Inc., 353 F.3d 1158, 1169 (10th Cir. 2003))); Trejo v. Cingular Wireless, LLC, Civ. No. B-05-094, 2007 WL 1189643, at *5-6 (S.D. Tex. Apr. 19, 2007) (analyzing Fifth Circuit case-law and mini-RIF cases from the Seventh Circuit and finding that plaintiff established prima facie age-discrimination case by showing, along with other elements, that only younger employees remained after he was terminated); Kerber v. C.J. Winter Machine Works, Inc., 939 F. Supp. 213, 220 (W.D.N.Y. 1996) (finding that employee established prima facie case of age discrimination where plaintiff was terminated and "his job responsibilities ... absorbed by other younger employees").

plaintiff to show by a preponderance of evidence that the employer's proffered reason was pretextual, and that race was the real reason for the employment decision.   St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515-16 (1993).

A Title VII plaintiff who cannot prevail under the McDonnell Douglas framework may nevertheless succeed under the framework set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), which was subsequently modified by Congress in the Civil Rights Act of 1991.   In Price Waterhouse, the plaintiff alleged that her employer, a nationwide professional accounting partnership, did not grant plaintiff admission to the partnership because she did not meet the partner's stereotypes of how women should act; the employer responded that the decision was based on her lack of interpersonal skills.   Id. at 231-32, 234-35 (plurality op.).   After a bench trial, the district court found that the partnership's concerns about the plaintiff's interpersonal skills were legitimate and not pretextual; but, it also found that the partnership's decision was influenced by sex stereotyping.   Id. at 237.   After judgment for the plaintiff was affirmed on appeal, the Supreme Court "granted certiorari to resolve a conflict among the Courts of Appeals concerning the respective burdens of proof of a defendant and plaintiff in a suit under Title VII when it has been shown that an employment decision resulted from a mixture of legitimate and illegitimate motives."   Id. at 232.

Six justices agreed that a plaintiff can prevail in a title VII case by showing that an illegitimate factor influenced the employer's decision, although they disagreed over the details.   Id.   Justice Brennan, writing for a four-justice plurality, concluded that if a plaintiff proves that an improper factor "played a motivating part in an employment decision," the defendant may avoid liability only by showing "by a preponderance of the evidence that it would have made the same decision even if it had not taken" the improper

factor into account.   Id. at 258.   Justice White concluded that a plaintiff must show that the improper factor played "a substantial role," (rather than just a "motivating part") in the decision before the burden will shift to the defendant.   Id. at 259 (White, J., concurring in the judgment).   Justice O'Connor concluded that the burden would shift to the defendant only when the plaintiff showed "by direct evidence" that discrimination was a "substantial factor."   Id. at 276 (O'Connor, J., concurring in the judgment).

Responding to what it viewed as a "cramped interpretation of Title VII" in Price Waterhouse and other Supreme Court cases, Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 661 (2007) (Ginsburg, J., dissenting), Congress enacted the Civil Rights Act of 1991, which amended Title VII.   See Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2538–40 (2013) (Ginsburg, J., dissenting) (citing statutory statement of purpose along with legislative history).   The 1991 Act added § 2000e-2(m), which permits a plaintiff to establish a claim for relief by showing that discrimination was "a motivating factor" in an employment decision.   It also provides the employer with a partial affirmative defense–"which does not absolve it of liability, but restricts the remedies available to a plaintiff," Desert Palace, Inc. v. Costa, 539 U.S. 90, 94 (2003)–if the employer can show that it "would have taken the same action in the absence of the impermissible motivating factor."   42 U.S.C. § 2000e-5(g)(2)(B).[6]   The Eleventh Circuit has construed the 1991 Act to have no effect on § 1981 claims, which are governed by the unmodified Price Waterhouse framework.   Mabra v. United Food & Commercial Workers Local Union No. 1996, 176 F.3d 1357, 1368 (11th Cir. 1999).   However, with respect to FCRA claims alleging discrimination based on race, color, religion, sex, or

---

[6] Although the 1991 Act superseded Price Waterhouse, for convenience I refer to the mixed-motive framework set out in Price Waterhouse and modified by the 1991 Act as the "Price Waterhouse framework" or "Price Waterhouse standard."

national origin, courts have applied the modified <u>Price Waterhouse</u> framework.   <u>See,</u> <u>e.g.</u>, <u>Torres-Skair v. Medco Health Solutions, Inc.</u>, 595 Fed. Appx. 847, 852-53 (11th Cir. 2014).

A plaintiff may use the <u>Price Waterhouse</u> framework whether or not she has "direct evidence" of discrimination.   <u>Desert Palace</u>, 539 U.S. at 101-02.   Defendant's argument to the contrary is based on an Eleventh Circuit case that predates <u>Desert Palace</u> and is no longer good law on this point (Doc. 44 at 11 (citing <u>Silvera v. Orange Cnty. Sch. Bd.</u>, 244 F.3d 1253, 1258 (11th Cir. 2001))).   As the Ninth Circuit explained in its decision in <u>Costa v. Desert Palace</u>, 299 F.3d 838 (9th Cir. 2002) (en banc)–which the Supreme Court unanimously affirmed in <u>Desert Palace</u>–"the plaintiff in any Title VII case may establish a violation through a preponderance of evidence (whether direct or circumstantial) that a protected characteristic played 'a motivating factor'" in the decision.   <u>Id.</u> at 853-54.

The <u>Price Waterhouse</u> standard is easier for a plaintiff to meet than the <u>McDonnell</u> <u>Douglas</u> standard.   Indeed, a plaintiff who cannot meet the <u>Price Waterhouse</u> standard would appear to lose under <u>McDonnell Douglas</u> as well, because if the evidence does not allow a factfinder to reasonably conclude that discrimination was a "motivating factor," it is hard to see how it would allow an inference that discrimination was the "real reason" for the adverse employment action.   If the Court finds only that a plaintiff has not met the <u>McDonnell Douglas</u> standard, the plaintiff might still prevail under the <u>Price Waterhouse</u> standard.   But, if the Court finds that a plaintiff has not met the <u>Price Waterhouse</u> standard, then the plaintiff's claim necessarily fails under either test.

2. Retaliation

In addition to barring discrimination, Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees ... because he has

opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."   42 U.S.C. § 2000e-3(a).   The Supreme Court has explained the "primary purpose" in Title VII's anti-retaliation provision as "[m]aintaining unfettered access to statutory remedial mechanisms."   Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997).   The anti-retaliation provision of FCRA parallels Title VII's.   See FLA. STAT. § 760.10(7).   Section 1981 does not expressly prohibit retaliation against those who oppose racial discrimination in the "making, performance, modification, and termination of contracts," but the Supreme Court has construed it to allow a cause of action for retaliation.   CBOCS West, Inc. v. Humphries, 553 U.S. 442, 446 (2008).

To survive summary judgment on a Title VII retaliation claim, an employee must show that "(1) she participated in a statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there is a causal connection between the two."   Evans v. Books-A-Million, 762 F.3d 1288, 1298 (11th Cir. 2014).   While these elements appear to parallel those for a discrimination claim under Title VII, there are two important distinctions.   First, the "materially adverse action" element of a retaliation claim is much broader and more easily satisfied than the "adverse employment action" element of a discrimination claim, encompassing all "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 5, 67, 68 (2006) (internal quotations and citations omitted).   Second, the standard of causation is higher: an employee must

show that "her protected activity was a but-for cause of the allegedly adverse action by the employer." Nassar, 133 S. Ct. at 2534.[7]

## III. Discussion

Defendant's summary judgment motion relies on the requests for admission Plaintiff failed to answer. Under Rule 36, admissions that are not answered or objected to within 30 days are deemed admitted. FED. R. CIV. P. 36(a)(3). "A matter admitted under [Rule 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." FED. R. CIV. P. 36(b). "[T]he court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Id.

If Plaintiff is held to her admissions, her claims cannot survive summary judgment. The deemed admissions include that Plaintiff "w[as] not retaliated against for engaging in protected activity" and that she "w[as] not discriminated against based on your race."

---

[7] Relying on a federal district court decision from Alabama, Defendant asserts that the "but for" standard means that Plaintiff must show that her protected activity "was the one and only cause of her separation of employment." (Doc. 44 at 20 (citing Dixon v. City of Birmingham, No. 2:13-CV-404-WMA, 2015 WL 363162, at *1 (N.D. Ala. Jan. 27, 2015))). Dixon is one of a number of cases, mostly from a single judge in the Northern District of Alabama, equating but-for causation with sole causation. See also Donald v. UAB Hosp. Mgmt., LLC, No. 2:14-cv-727-WMA, 2015 WL 3952307, at *3 (N.D. Ala. June 29, 2015) Holley v. Gibco Constr., No. 2:14-cv-2277-WMA, 2015 WL 2365580, at *2 (N.D. Ala. May 18, 2015); Savage v. Secure First Credit Union, __ F. Supp. 3d __, __, 2015 WL 2169135, at *4 (N.D. Ala.), appeal docketed, No. 15-12704 (11th Cir. June 17, 2015); Montgomery v. Bd. of Trs. of the Univ. of Ala., No. 2:12-CV-2148-WMA, 2015 WL 1893471, at *4 (N.D. Ala. Apr. 27, 2015); Culver v. Birmingham Bd. of Educ., 646 F. Supp. 2d 1270, 1271-72 (N.D. Ala. 2009).

These cases have received a chilly reception in other courts. Culver has been rejected by other judges in the Northern District of Alabama, see, e.g., Howell v. Morrison Management Specialists, Inc., No. 4:10-CV-1587-RDP, 2013 WL 6568935, at *6 (N.D. Ala. Dec. 13, 2010) (adopting magistrate judge's R&R, which noted that "at least two other [Northern District of Alabama] judges" and "nearly all other federal courts considering the matter" have rejected arguments equating but-for causation with sole causation), and another Alabama district judge called it "illogical," Freeman v. Koch Foods of Alabama, No. 2:09-CV-270-MEF, 2010 WL 9461668, at *2 (M.D. Ala. June 15, 2010). More importantly, these cases directly conflict with Eleventh Circuit precedent holding that but-for causation does not mean sole causation. See McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1073-76 (11th Cir. 1996).

(Doc. 44-1, ¶¶ 11-12; see also id., ¶ 14).   These admissions alone are sufficient for the entry of summary judgment for Defendant.   Plaintiff has also admitted that she fell short of work requirements to maintain her employment, that she was "terminated ... because of [her] insubordinate, unprofessional behavior," that she was "not qualified to perform [her] job," that she was not treated less favorably than similarly situated employees outside her race, and that "[her] insubordinate and unprofessional conduct constitutes a legitimate, nondiscriminatory reason for [her] termination."   (Id., ¶¶ 1-10, 13).   Plaintiff has gone on record stating that she will not "dispute" or "give testimony" that is contrary to these admissions, but that she "will ... dispute ... Davila['s] False Declaration that [Defendant] Used To Support Their Defense," and that she will prove that the documents Defendant submitted in support of its motion are false (Doc. 51 at 2).   Plaintiff's evidence conflicts with several of the admissions and raises what would be disputed questions of fact, but for the admissions.[8]   But, as of the date of this report and recommendations, Plaintiff has not filed a motion to withdraw or amend the admissions.

The Eleventh Circuit has held that district courts have "broad discretion" to determine "the scope and effect of admissions," Johnson v. DeSoto Cnty. Bd. of Comm'rs, 204 F.3d 1335, 1341 (11th Cir. 2000), but it has not addressed whether a court can refuse to accept an admission on its own initiative.   Substantial authority holds that a court may not *sua sponte* withdraw or amend an admission made under Rule 36.   In American Automobile Association v. AAA Legal Clinic of Jefferson Crooke, P.C., 930 F.2d 1117 (5th Cir. 1991), the Fifth Circuit expressly "rejected" the argument that "admissions may be withdrawn or amended *sua sponte*."   Id. at 1120.   The Ninth Circuit has

---

[8] For example, Plaintiff's response controverts her admission that she behaved "insubordinate[ly] and unprofessional[ly]" and that nobody at Starbucks made "derogatory comments about [Plaintiff's] race."

explained that a court may not "ignore" Rule 36 admissions "simply because it finds the evidence presented by the party against whom the admission operates more credible." Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n, 465 F.3d 1102, 1112 (9th Cir. 2006); see also GTE Directories Corp. v. McCartney, 11 Fed. Appx. 735, 737 (9th Cir. 2001) (holding that a party's introduction of evidence contradicting admission "cannot serve as an 'implied' motion to withdraw").   The Fourth Circuit has reached the same conclusion in an unpublished opinion.   Adventis, Inc. v. Consol. Prop. Holdings, Inc., 124 Fed. Appx. 169, 173 (4th Cir. 2005) (citing AAA favorably and holding that district court abused its discretion in ignoring Rule 36 admission).   The Seventh Circuit has emphasized that a motion to withdraw is "the proper procedural vehicle through which to withdraw admissions."   United States v. Kasuboski, 834 F.2d 1345, 1350 (7th Cir. 1987).   Several federal district courts have also concluded that absent a motion, a court may not relieve a party from the binding effect of an admission under Rule 36. Broadcast Music, Inc. v. Hub at Cobb's Mill, LLC, Case No. 3:13-CV-01237, 2015 WL 1525936, at *5 (D. Conn. Apr. 2, 2015) (analyzing case law on the question); Jacobs v. Elec. Data Sys. Corp., No. 2:05CV925-MHT, 2006 WL 3742202, at *2 (M.D. Ala. Dec. 18, 2006).

These courts point primarily to the language of Rule 36(b), which permits withdrawal of an admission "on motion," in holding *sua sponte* withdrawals or amendments impermissible.   This textual argument is buttressed by the fact that elsewhere in the Rules, the court is authorized to act "on motion *or on its own*," see, e.g., FED. R. CIV. P. 16(f) ("On motion or on its own, the court may issue any just orders [for noncompliance with a scheduling order or nonparticipation in a scheduling or other pretrial conference]."); FED. R. CIV. P. 21 ("On motion or on its own, the court may at any

time, on just terms, add or drop a party."); FED. R. CIV. P. 26(b)(2)(C) ("On motion or on its

own, the court must limit the frequency or extent of discovery...."); FED. R. CIV. P. 26(g)(3)

("If a certification violates [Rule 26(g)] without substantial justification, the court, on

motion or on its own, must impose an appropriate sanction...").   If the express

authorization of *sua sponte* action in some provisions of the Rules means anything, it

must be that the court's discretion to act *sua sponte* where the rules permit action only

"on motion" is at least substantially limited.   In addition to the text-based argument, other

courts reason that *sua sponte* reconsideration of admitted matters undermines the

purpose of Rule 36.   See, e.g., AAA, 930 F.2d at 1121.

Some courts–most notably the Sixth and Tenth Circuits–have taken a more

permissive approach.   The Sixth Circuit, in Kerry Steel, Inc. v. Paragon Industries, Inc.,

106 F.3d 147 (6th Cir. 1997), affirmed a trial court's decision to construe "statements

made by defense counsel at oral argument" as a Rule 36(b) motion, grant the motion, and

permit the defendant to withdraw admissions.   Id. at 154.   The court said defense

counsel "argue[d] at the hearing on the motion to dismiss that the plaintiff's requests for

admission should not be deemed admitted," while in AAA, "the court acted entirely on its

own. Id. at 154.

In Bergemann v. United States, 820 F.2d 1117 (10th Cir. 1987), the Tenth Circuit

affirmed a trial court's decision to permit the government to withdraw admissions.   Id. at

1120-21.   There, the government failed to respond to the plaintiff's requests for

admissions, and the plaintiff moved for summary judgment based on the admissions.   Id.

at 1118.   In its response, the government said its lawyer had not received the requests

for admission before the plaintiff filed the summary judgment motion.   Id.   In denying

summary judgment, the trial court found that the government "had not received the

original request" or otherwise receive notice of the request.   Id.   On appeal, the plaintiff argued that withdrawal of the admissions was inappropriate because the government did not file a motion.   Id. at 1120.   The court criticized this argument as "overly technical." Id. at 1120.   It noted that the government's response to the summary judgment motion argued that it had not received the requests and should not be deemed to have admitted them, and that the issue was litigated at two separate hearings on the motion for summary judgment.   Id.   1120-21.   The Court explained that "both the response to [the plaintiff's] motion for summary judgment and the recorded pre-trial hearings in this case were, in essence, motions to withdraw the admissions."   Id. at 1121.

Even in Bergmann and Kelly, the district courts identified something that could be construed as a motion to withdraw before allowing an admission to be withdrawn.   These cases support the idea that the admitting party must somehow raise the issue of whether it should be allowed to withdraw the admission.   Even if a party is proceeding pro se, Presentation of testimony or other evidence that conflicts with an admission cannot, by itself, "serve as an 'implied' motion to withdraw."   GTE Directories Corp., 11 Fed. Appx. at 737.   To allow a party to withdraw an admission simply by presenting conflicting evidence would be to render the admission meaningless.

A handful of district court decisions have relieved pro se litigants from deemed admissions in the absence of any apparent motion.   Medina v. Donahoe, 854 F. Supp. 2d 733, 748–49 (N.D. Cal. 2012); Jones v. Jack Henry & Assocs., Civ. No. 3:06cv428, 2007 WL 4226083, at *2 (W.D.N.C. Nov. 30, 2007); In re Savage, 303 B.R. 766, 771-73 (Bankr. D. Md. 2003); United States v. Turk, 139 F.R.D. 615, 618 (D. Md. 1991).   The common thread in these decisions is the courts' recognition that pro se litigants may not understand the effect of failing to answer requests for admission and that they should not

be punished for their lack of understanding of federal civil procedure by deeming unanswered requests admitted.   That concern is nominal at best in this case because Defendant's requests for admission recited, in plain terms, that failing to answer or object within thirty days would mean that the requests would be considered admitted and that plaintiff could not offer any evidence contradicting them.   See United States v. Renfrow, No. 5:07-CV-117-FL, 2009 WL 903202, at *4 (E.D.N.C. Jan. 26, 2009) (finding that requests for admission unanswered by pro se litigant would be deemed admitted where, unlike in Jones, Turk, and Savage, the litigant was notified in the requests of the consequences of ignoring them).

Despite being informed of the consequences of inaction, Plaintiff failed to respond to Defendant's requests for admission.   Then, after Defendant relied on the admissions in moving for summary judgment, Plaintiff not only failed to file a motion to withdraw her admissions, she expressly disclaimed any intention to do so.   She has not explained why allowing her to withdraw the admissions would "promote the presentation of the merits of the action," and Defendant has not had an opportunity to "persaud[e]" the Court that "it would prejudice [Defendant] in defending the action on the merits."   FED. R. CIV. P. 36(b). Accordingly, I find that Plaintiff has not "moved" to withdraw her admissions under Rule 36(b), and that in the absence of such a motion, the Court must accept the admissions as "conclusively established."   The admissions establish that Plaintiff was not "discriminated against" or "terminated based on [her] race," and that she was not "retaliated against for engaging in protected activity" or "terminated for making any internal complaints." (Doc. 44-1 at 5-6).   In other words, Plaintiff cannot raise a genuine dispute of material fact on these issues in the face of her admissions.   And under the facts, as established

by Plaintiff's admissions, Defendant is entitled to judgment as a matter of law on all of its claims.

## IV. Recommendation

Upon consideration of the foregoing, I respectfully recommend that Defendant's motion for summary judgment (Doc. 44) be **GRANTED** and that judgment be entered accordingly.

Specific written objections may be filed in accordance with 28 U.S.C. § 636, and M.D.Fla.R. 6.02, within fourteen (14) days after service of this report and recommendations.   Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

**RESPECTFULLY RECOMMENDED** at Orlando, Florida on August 5, 2015.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

     Presiding United States District Judge
     Plaintiff, pro se
     Counsel of Record